Morning ladies and gentlemen, the first case for argument is Cubs Cabs, Joe Sanfilippo Cabs v. Milwaukee. Mr. Sanfilippo? May it please the court. Good morning, your honors. Steve Sanfilippo for appellants who are long-time City of Milwaukee taxi cab permit owners. Appellants have raised four issues before the court. I'd like to talk about two of those today. The first being the district court's finding that they did not have a property interest in the value of their permits, and the second being the district court's finding that they did not have a plausible promissory estoppel claim. First, with respect to the property interest claim, as this court and others have recognized, the property interest can arise not only from the language of a statute, but also from mutual understandings, evidencing an intent to create a property interest. Appellants pled a viable property interest claim arising from just such a mutual understanding, and that mutual understanding was evidenced from three sources. First is the statements of the City Council contained in the legislative record, and those statements were such as, we are creating a property right in a public license. We're giving the owners assets and equity. This ordinance makes the licenses very valuable. That's all language indicating an intent to create a property interest, not just in the use of the permit, but in the value of that permit. The second source from which this mutual understanding is evidenced is the language of the statute itself. This isn't the type of statute like it was in Minneapolis Taxi, where the city expressly retained the right to issue more permits and, in fact, had a duty to investigate every two years whether more permits were needed. Here, the city, on the face of the statute, expressly disclaimed the right to issue more permits. They did that with the express intent of creating a secondary market to be the sole source in which you could... Now, what did they say about additional permits? They said they wouldn't grant them? That the city would not be issuing more permits, and the legislative history makes... That's always subject to repeal. Sure, it's always subject to repeal, Your Honor, but if you look at the legislative record, the intent was that, sure, it could be changed. They could issue more tags in the future if there was a finding that more cabs were needed to service the market, not that... The whole statutory scheme can be changed, or scheme in the ordinance. We're talking about a municipal ordinance here. The entire regulatory scheme is subject to change by subsequent city councils. You can't ever reasonably rely on static legislation. It is subject to change, but it shouldn't be subject to change in a way that completely wipes out value that you potentially created. Wait, but what is more common than for a new technology to come along and destroy the existing technology, or for a new business model to arise, and existing businesses are crushed, right? But this isn't a new... When taxis came to... Motorized taxis came to New York around 1900. What do you think it did to the horse and buggy taxis? Probably wiped the horse and buggy. Knocked them all out, right? It probably did, but I'm not sure that there was any promise to the horse and buggy folks that they were creating a property interest in the value of their business, as there was clearly found from this legislative record. And yes, could they amend the statute, just like they did in 2013? What is the clearest statutory language on which you rely? It would be the language... The statutory language on the face of the 1990... Where in your brief? You quote it in your brief? May I... I don't have my brief in front of me, Your Honor. I'll bet it does. Effective January 1st, no new public passenger vehicle permits for taxi cabs may be issued. And then the only exception in that language was to allow for permit owners to transfer their tags to other buyers. And the legislative history makes clear... What in your... What you read forbade additional permits? The fact that no new public passenger vehicle permits may be issued. So as long as this regulatory scheme is in effect, if the regulatory scheme is changed, it's changed. I mean, that's the nature of legislation. It absolutely is the nature of legislation, but once you create a property interest in the value and then have folks rely upon that for 22 years... There was property interest in the permit itself, the right to operate a taxi cab pursuant to that permit, not in a secondary market for the permits. That couldn't be the property interest that was created by the 92 Ordinance. That property interest has existed under Wisconsin law since the 1950s. The Wisconsin Supreme Court in 1951... Right, and it didn't change with this legislation. No matter what the city council people said, that's not... So... That's not a promise, it's not a mutual expectation, those are just political statements. It was held out to the city to be the legislative record that supported implementation of the Ordinance. I'm still hung up on the fact that, okay, the Ordinance was enacted, but I can't understand why there was a promise made to San Filippo. I hope I'm saying that name correctly. The city didn't guarantee anything. The city could change or revoke based on economic or technical advances in public transportation, and that's what But UberR, if anything, didn't justify removing the cab. If anything, it justified leaving the cab. The purpose for the cab, as the city has stated often, is a trade-off. They regulate the rates that a cab company can make. The trade-off there is they will limit competition with a cab. Sure, could the cab increase? Are they going to issue more tags? Yeah, as they did in 2013. That's why, really, there was no viable claim of a taking in 2013, because they implemented a study. They said, we need more cabs, service the market, we're going to put 100 more, and then that statutory scheme said, any more cabs we issue is going to be based upon a finding that we need more to service the market. It wasn't until 2014, just six months later, where they said, you know what, we're just going to rip the cap off, Uber's here, we're going to open everything up. Yet, they didn't rip away the provisions that allowed them to continue regulating the rates. And you had folks that relied for 22 years on the scheme that was in place. Now, you're right to a point. If you cannot have a property interest and a mutual understanding, then this will be the first case that has turns on whether or not the pleading alleged... It doesn't turn on statutory language? Well, it does, but the statutory language is more an embodiment of the creation of the property right. It's the vehicle that they used. They created the property right by intentionally creating the secondary market to be the exclusive place where you could get permits through. That drove up the value of the permits. And they knew what they were doing when they enacted the statute, and they knew that it was going to drive the value of the permit up. So yeah, it's the statutory language, but it's really what the statutory language did. It carried out their intent to create a value in these permits. So your position is there was a promise by the city to sustain a property interest in value. I mean, that's really what it comes down to, isn't it? It's the value part that matters in the secondary markets. The value part. Yes. To not arbitrarily destroy it. Not to never diminish it. Not to never issue another permit again. They knew, and it was clear from the legislative record, that if more permits were needed to service the market, then there would be more permits that could be issued. But nobody would have expected or intended that they would completely wipe out the cap system altogether. Well, you said in your brief, the city represented that any future amendments would be based upon a finding that more permits were needed to adequately service the market. Doesn't that give the city full reign? And that's what they did. All they have to do is find they need more permits and they... Exactly. And when they took the cap off... What are you saying? They didn't make that finding? In 2014, when they took the cap off... Did they make that finding? No. There was not a finding. There was a finding in 2013. They needed to issue 100 more tags. They issued the tags. Six months later, they took the cap off altogether. There wasn't a finding that the market needed more permits and the city needed more caps. What they did was they said, well, Uber's here. We have them. We have the folks that say that the cap, as it was, which is as the judge in Ibrahim recognized, it wasn't really a cap at all. Why isn't that the finding? Why isn't that the finding? That's not a finding that you need more caps in the market. That's just a decision that, hey, thanks for the 22 years of relying upon our system, but we think we're going to go in another direction. Well, isn't that the finding? The finding more permits are needed. But they didn't find more permits were needed. They just decided they were going to scrap the system. Yes, but they would do that because they thought more permits were better for, you know, for the people. Why else would they have done it? But the understanding from- What do you think they'd done it? Did it out of sheer malice or they were bribed by Uber or what? Your Honor, all I can tell you is- Suppose you have no evidence that they were either bribed or there was any other impropriety, then wouldn't that allow an inference that they thought more permits would improve service and having Uber there would improve the market, would improve the market, which would be perfectly legitimate, right? If you were talking about a merits analysis, sure. You're talking about a 12B6 analysis where the reasonable inferences are supposed to be taken in the way of the appellants. Well, why isn't that the natural inference? Unless you think they were bribed by Uber, then they must have felt that, you know, that transportation in the city would be assisted if people had this Uber alternative to the conventional cabs. There is nothing from the legislative history to show that they considered it- But are they required to make some formal finding rather than just doing something which is based on the obvious point that having Uber, which is a different type of service in the market, may be beneficial for the public? Sure, but once having created the property right and allowed people to rely upon it for- But look, all you say, you say, all they have to do is make a finding that more permits are right in the public interest. An objective finding based upon something- What's an objective finding? They have to write a little treatise on how Uber is good for consumers? Is that what you want? It's not Uber, though. It's the fact that are more permits needed- No, I don't understand. What do you want them to say if they want to let Uber in? I want them to do a study to say that there's not enough cabs servicing the market right now. We need more permits because there are not enough cabs to service the market. That's what the 2013 statute would have required. That's not a proper understanding of Uber. Uber is a different type of service. It's a quasi-cab service. Pardon? It's a quasi-cab service. Call it quasi if you want. It's a different type of service. It's different from hailing a cab on the street, right? You type something into your cell phone and all of a sudden a car appears and whisks you off, which is something consumers value. Now, isn't it permissible for the city to say we think this is a valuable service for people? Absolutely. If the city makes a decision 22 years later that it wants to go in another direction- What if they said, we think it'd be nice if people could go around the city in helicopters. We're going to allow helicopters to land and pick people up and carry them around. Now, would they have to make a finding that more permits were needed to adequately service the market in order to permit helicopter traffic? I don't know that you would necessarily have to lift the cab permit in order to allow helicopters to fly- Okay. Why not the same argument with Uber? Uber is not a conventional cab service, so it's not a matter of more permits for conventional cabs. It's an opportunity for local transportation. And if that's the case, then why lift the permit cap at all? Well, the reason the permit cap was lifted here is that there was a state court decision invalidating the cap. Not invalidating the cap, invalidating the prior system. The city attorney recognized that a cap system in and of itself is constitutional. It just needed a better legislative record. Well, that's not what the circuit court judge said. It was a broader invalidation than that. Not just on the absence of findings. There was more to it than that. It was a state constitutional holding, as I understand it. The circuit court judge recognized it wasn't a cap. It was the downward floating component of it that was what made it unconstitutional. Right, which is functionally a cap. A cap that reduces through attrition. Exactly. Right, and that's unconstitutional under the state constitution, so the system had to be reformed, even setting aside the Uber and Lyft competition. Exactly, and it was in 2013 to issue 100 more permits and put in a cap that was constitutional. Well, right, that was one possible legislative response. Another possible legislative response is the one that came a year later once Uber and Lyft were in the marketplace, which was to eliminate caps altogether. And under that new ordinance, the new ordinance didn't revoke current permits and continue to allow permit transfers, right? But as the city recognized who in their right mind would purchase a permit on the open market when you can go down to city hall and get one for free. It destroyed the value of the permit. Okay, well, thank you, Mr. Champ. Thank you, Your Honor. Mr. Stevens. Good morning, Your Honors. Adam Stevens, may it please the court. The city respectfully requests the court to find that the district court was correct in its decision that stated that the plaintiff's amended complaint failed to plausibly plead, both that the plaintiffs had a constitutionally protected property interest in the value of their tax cap permits on a secondary market that was not regulated by the city, and also that the 2014 ordinance amendment did not constitute a taking. Let me ask you this, in lifting the cap completely, did the city consider the stark financial impact it would have on the current permit holders? Well, Your Honor, I'm sure there was a portion of discussion that was contemplated in that. I can tell you that in the process over the course of the few years where the city was litigating in state court with the interveners in this case and ultimately lost that case, there was quite a few committee hearings, public safety committee hearings, subcommittee hearings, where a lot of discussion was going on. And as has already been debated here today, there was a consideration that just simply lifting the cap by 100 would be sufficient. And of course, the question of whether or not the value of these permits probably came up. The reason I say probably is please recognize that unlike many other systems nationally, Milwaukee did not participate in the secondary market, meaning the city did not auction off the permits, the city did not receive any compensation for these permits, it was purely a secondary market. So much so that the city had no real evidence whatsoever until it was provided by plaintiffs in the state case and then the plaintiffs in this case, how much the value of these permits were on the secondary market, meaning the city didn't even inquire as to it. So what you had with this downward floating cap pre-2013 was the compression. I believe the record indicated that there was approximately 380 or so permits in 1991, 1992, and those decreased by about 50 over the course of those 22 years. Over the course of what? The 22 years between the downward floating cap being installed in January 1st of 1992 until it was additional licenses were granted? Well, in 2013, after the state court decision... No, I'm talking about between 1992 and 2013. No, no. But none, but there were about 50 that ceased to exist through either a revocation or non-renewal because these permits were... So they weren't replaced? Excuse me? So they weren't replaced? They were never replaced. So the number kept floating and that's why we call it a downward floating cap because it was a cap, it couldn't go up, but it could only go down. And during that time, the San Filippo firm acquired almost half of the existing permits, as I understand the record. Correct. As the amended complaint indicates, they owned about 162 permits, I believe, as of the date of the amended complaint and there was 320 in existence in the city of Milwaukee before 2014. Suffice it to say too, I would point out to the court, taking a step back here a little bit too, in terms of the finding of the district court, we of course agree with the analysis put forth, but there is something that I think it's worth discussing, is that the city of Milwaukee is authorized specifically by state statute to regulate taxi cabs. And that is found, and frankly the plaintiff's appellants lead their brief with that indication, there's a state statute that authorizes the city of Milwaukee to do so. And given that the city is a creature of the state and merely a political subdivision of the state, the city can only do that which the state authorizes. The city has home rule. There is some home rule issues and there has been a fair amount of litigation, so I'm treading very carefully in this discussion, your honor, because I'm one to support the homeroom analysis and support the city, but I do think it's important though in the context of whether or not there was a promise made, whether there was a contract made, or whether there was a reasonable property interest expectation by the plaintiffs here, because fundamentally we have to rely on the state to give us the authority to regulate the transportation network companies, which are Uber and Lyft. So for a time, with the 2014 amendment, our city, unlike many other cities, and I think including the case that is next before you, we handled and viewed the transportation network companies   a little bit differently. We felt as though they really were public passenger vehicles and they did not need to be regulated in the same way that a traditional taxi cab did for consumer protection purposes, but ultimately we licensed for that short time in 2014 until the state took away the authority for us to regulate. We regulated Uber and Lyft in the same way we regulated taxi cabs, hence why we lifted the cap, so we could bring them under the regulatory scheme. But you can't do that anymore? Correct. The state of Wisconsin took that authority in a different state. Do they regulate Uber? They do. It's a state regulated industry now directly. They regulate the companies themselves and then somewhat indirectly, they don't directly license the drivers. The city of Milwaukee was choosing to regulate the permits, meaning the vehicle permit per vehicle, whether it was a cab or Uber, and then also regulate directly the drivers who are licensed to do that. So the state chose a different path, which they're entitled to do and which obviously the city has to comply with. Well, in terms of anticipating that expected permit holders would rely on the valuable asset that was created because they had their taxi medallion, the idea that the market value would permit permit holders with retirement funds was discussed by the legislature in enacting the ordinance, wasn't it? So when we talk about this value component, there was some discussion. There was discussion in the 1991 regulation whether or not, and there was pros and cons for that. The pro of creating value was that there was a hope that this process would self-regulate the industry rather than having the city take the laboring war and regulating it. That was the pro. The con was where is this going to go in terms of how much value, and fundamentally the city wasn't even keeping track of it. So we had, there was discussion of that and what happened happened as the plaintiffs have pled that the value of those permits increased to a wildly expensive thing. But ultimately, as was discussed in our brief, the city never captured any of that money. We never participated in that market, and this was a business transaction that the plaintiffs engaged in for 22 years. And frankly, I'd also indicate that they enjoyed the benefit of this. They what? The plaintiffs enjoyed the benefit of this monopoly-like system because for 22 years they had, or at least ending in 22 years, had over half the permits that were available in the city of Milwaukee. So they did receive value in that, but ultimately the city did not take any of their permits. I'm going to see my light. The city did not take any of their permits away. We did not restrict their ability to lease, which was another fundamental way that they made money, is they were able to lease it to drivers who couldn't afford their own cars, to licensed drivers, and they're still allowed to transfer those, and that hasn't changed. Before you sit down, do we have a ripeness issue in this case on the takings claim? Can this be litigated, or is there an inverse condemnation action for this kind of personal property takings claim? We did not litigate that, Your Honor, and I have not looked into that in the sense that I'm prepared to answer one way or the other. I think we have been litigating this case for so long that it just wasn't contemplated thus far. Right, and in this context, the Williams County ripeness rule may or may not be jurisdictional. It's probably more of a prudential rule, so the failure to raise it... I don't think... I'm sorry. But was there a notice of claim? The district court judge dropped a footnote about this issue saying something to effect of a notice of claim may have been filed, unclear. Right, and I don't believe a notice of claim was filed in this case, but I think given the context of how this case came in over the course of two separate actions and filed in different district courts over the course of 2014, and then given the litigation that had been ongoing in state court, that I think I certainly wouldn't be pushing that plaintiffs should have done something in state court before bringing this action. But clearly, if this court determines that it is, you know, a different way, that's... But you're... I mean, you're in the city attorney's office, right? So you know the condemnation code. Does... Can it even be used in this situation? Well, I would hesitate to say that I think... I would hesitate to offer that. Okay, that's fine. Thank you, Your Honor. Okay, thank you, Mr. Stevens. Thank you, Mr. Sanders. May it please the Court. Anthony Sanders on behalf of intervener defendants. Your Honors, in my time today, I'm going to address the merits of the case, but if you have any questions on the intervention questions, I'll be happy to address those. Five years ago, interveners could not own their own taxicabs. The cost of a taxi was approximately $150,000. So they sued the city in state court and they won. They won a binding final injunction on the city to not enforce its taxicab cap. The property interest at issue here is not the license itself. The property interest at issue is the right to exclude others from a market, and every federal court that has addressed that issue has found that there is no such property right either under state law or protected by the Fifth Amendment. This court has not exactly ruled on that issue, but it came pretty close in not a one-way ratchet. Under Wisconsin law, there is no property interest in excluding others from a market, but not only is there no constitutional claim in this case, there are profound public policy reasons that arise as well. As the Reason Foundation stated in its amicus brief, if you allow a taking in this case, it would freeze many, many other municipalities who are looking into reforming their own transportation systems and adding more market competition. If they have to pay off existing already protected competitors who have already received economic rents from that system, it will freeze those systems in place. I'd like to address something interveners have a very special interest in in this case, which is the prior case that was addressed in state court. In that case, and you can find this on pages 10 to 11 of the district court's ruling on May 30th, which is at docket 25-5 in the district court, the state judge, district court judge, Judge Carroll said that the cap was unconstitutional under the Wisconsin Constitution, both because there was a money. She did not say because of the exact legislative record that the city created that this happened to be unconstitutional. So when the city lifted the cap, that ruling still stood, and that cap, the new cap that was created very well might have also been unconstitutional under the state constitution. It was only when the cap was fully lifted that the city finally complied with the Wisconsin Constitution. One other issue that was raised is the financial impact on current permit holders. Well, there's another financial impact, and that is the impact on the drivers, on interveners, before they were able to lift the cap. People working long hours to a protected monopoly and not able to make adequate wages for themselves. That's why they went to court in the first place. Now they can own their own cap. They compete against each other. They compete against Uber and Lyft. They can compete against city bus service, but they're able to make a living because they don't have to pay this huge entry fee at the beginning of their business. They also briefly addressed the Williamson County question that you raised, Judge Sykes. Williamson County is a prudential doctrine. The Supreme Court, I believe, has stated that a number of times. And so there's no jurisdictional bar to this court addressing it. It's purely prudential. After the state court case, after a few years of litigation in this case where no party has raised Williamson County, I think it makes judicial sense for this court to address the issue instead of sending it back to state court for perhaps another five years, and then we'd be back in federal court again. So if there are no further questions, I'll yield the balance of my time. But we ask that this court affirm the district court, find that the city acted properly in deregulating its market, and again, I will yield the balance of my time. Thank you. Okay. Thank you, Mr. Sanders. Mr. Sanfilippo, if anything further? You know, you can have a minute if you'd like. I would just make one final point, and I'll make it quickly, Your Honor. This council recognized when they passed this ordinance in 1991 that there was no other corollary within the realm of licensing in the city of Milwaukee or the state of Wisconsin where they had ever created a private property right in a public license. This is unlike any other statute or any other issue that has been addressed by any other court. If this court looks at this record and says there is no such thing as a mutual understanding giving rise to a property interest in the tags, so be it. You'll be the first one to do it, and in my mind, this is a case of first impression for you, but if you can ever have a property interest arise from a mutual understanding, this is the case. It's really creating a cartel, isn't it? No. It's creating a property interest in the value, and once you go in another direction, you're free to go in another direction, but then you have to protect the property, the reliance interests of the folks who relied on your previous system for the previous 22 years. But, I mean, someone else, I mean, ordinarily you can have new entrants into a market compete with the existing suppliers of whatever service is involved. And they expressly chose to have a different system. That's kind of unusual. It's very unusual. Government to create cartels. And that's what two judges found, the state court judge in Ibrahim, the federal judge in Batawan, both of them found that based upon the city's actions and the permit holders' reliance upon those actions, at least a plausible, protectable property interest arose. Well, your opponents say it's not permitted by Wisconsin law for municipalities to create cartels. And they ought to have the right to raise that on summary judgment and on a merits analysis, but at the 12B6 stage, based upon the findings in the legislative record, there was enough in the pleading to raise at least a plausible claim. I don't understand. If Wisconsin law forbids this kind of cartelization, why wouldn't that be part of the case? That was their characterization of it as a cartel. That is not what the system was. Well, it's a cartel, right? The word restricts entry. It's not a cartel, Your Honor. Pardon? It's not a cartel. It restricts entry. You can go to the open market and get a permit. They created that. In fact, they created that avenue for permit holders. Well, if you have loads of money, you can get a permit. You can go to the bank, and at least you could when folks thought there was a property interest in the tag, you could get a loan on it. There's in a legislative record a guy, an owner who went through a divorce, and his wife got the $200,000 house, and he got the permit. That's not reliance upon having a property interest in the value? What is the benefit of this system to society? The system you're defending? The benefit is it increases safety because... It increases safety? Sure. The owners have a vested interest in investing in the cabs, investing in maintenance facilities to be able to maintain the cars, take them to inspections to make sure the drivers are over there. Are you saying there's a lower taxi cab accident rate in Milwaukee than elsewhere? I'm saying that the cabs... Are you saying that? I don't know what the accident rate is in Milwaukee. Well, then I don't know what you're talking about. I'm talking about the fact that... You just said this makes everything safer. You have... Well, then that implies there'd be a lower accident rate. You say you don't know what the accident rate is. As the city has recognized, it encourages investment in your business, including in the maintenance facilities, in insurance, in licensing, making sure that your drivers are qualified. That's why I'm asking you about the accident rate. Not in the record, Your Honor. Okay. Well, thank you very much to the whole council.